UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC,

Plaintiffs,

v.

NICK BROWN, in his official capacity as Attorney General for the State of Washington; and RYAN MORAN, in his official capacity as Director of the Washington State Health Care Authority,

Defendants.

No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "AbbVie"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against Nick Brown, in his official capacity as Attorney General for the State of Washington, and Ryan Moran, in his official capacity as Director of the Washington State Health Care Authority, challenging the constitutionality of Washington Senate Bill 5981 ("S.B. 5981"). In support, AbbVie alleges as follows:

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 1

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

## PRELIMINARY STATEMENT

1.      AbbVie brings this lawsuit to challenge the constitutionality of S.B. 5981—a recently enacted Washington law that requires, among other things, AbbVie to transfer its pharmaceutical products to certain hospitals and commercial pharmacies at substantially discounted prices on pain of civil penalties.  In so doing, Washington's statute violates the Supremacy Clause by, among other things, impermissibly changing the terms of and increasing the cost of participation in a federal drug-pricing regime—the federal 340B Program.  In addition, S.B. 5981 effects an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment, unlawfully discriminates against or unduly burdens interstate commerce in violation of the Commerce Clause, as established by Dormant Commerce Clause principles, and compels speech in violation of the First Amendment.

2.      S.B. 5981 arises out of a long-running dispute about the requirements that the federal 340B Program places upon drug manufacturers.  In short, the federal 340B statute, 42 U.S.C. § 256b, establishes a comprehensive program that requires pharmaceutical manufacturers to offer their drugs at statutorily set and significantly reduced prices to a list of fifteen specifically enumerated types of healthcare providers known as "covered entities." Offering these drugs to covered entities at the established significantly reduced price is required for manufacturers who want to participate in federal Medicaid and Medicare Part B. *See* 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

3.      Under the 340B statute, manufacturers are required only to "offer" their drugs to covered entities at the 340B price—not "sell" them unconditionally.   42 U.S.C. § 256b(a)(1).  That is, the 340B statute requires only that manufacturers make an offer at a particular price to a particular set of covered entities.  At the same time, it preserves the liberty of manufacturers to insist upon other non-price terms.  Commercial pharmacies, like Walgreens and CVS, are not among the 340B statute's list of entities entitled to an "offer" of the 340B price.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 2



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

4.      The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") exclusive authority to enforce its provisions.  *See* 42 U.S.C. § 256b(d).   The statute leaves no role for States or other third parties to change the requirements of the federal 340B Program or the conditions it imposes on manufacturers in return for participation in Medicaid and Medicare.  Nor do States or other third parties have any authority to enforce the federal statute's requirements.  The Supreme Court has confirmed as much, explaining that third-party enforcement "would undermine the agency's efforts to administer" the 340B Program and other related federal programs "harmoniously and on a uniform nationwide basis."  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119-20 (2011).

5.      Further, because forcing manufacturers to transfer their drugs at discounted prices to covered entities would raise serious constitutional concerns, Congress did not mandate participation in the 340B Program outright and instead tied it to an ostensibly voluntary choice:  participation in Medicaid and Medicare.  And to further incentivize manufacturer participation in the 340B Program—*i.e.*, to prevent the cost of participation from becoming too high—Congress carefully limited the Program and adopted certain safeguards to ensure that manufacturers' discounted drugs would be used to help needy patients rather than become a buy-low, sell-high scheme for commercial entities.  For example, in a statutory provision designed to prevent "diversion," Congress prohibited covered entities from transferring manufacturers' reduced-price drugs to anyone other than the entity's own patients.  *See* 42 U.S.C. § 256b(a)(5)(B).  In effect, that provision prohibits other commercial entities from either participating in the 340B Program or profiting from the sale of manufacturers' drugs at the 340B-discounted price.

6.      Nevertheless, over the last decade, covered entities have entered contractual arrangements with commercial pharmacies (called "contract pharmacies") that allow those pharmacies to earn windfall profits from the sale of manufacturers' drugs.  Instead of serving

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 3



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference. Contract pharmacies accomplish this arbitrage through a complicated accounting system known as the "replenishment model," described in more detail below. The bottom-line result is that for-profit commercial pharmacies and the covered entities they contract with pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B Program.

7.      Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States. They solely exist in the 340B context, where they are unauthorized by statute. AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model. Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

8.      In response to these abuses, manufacturers (including AbbVie) have exercised their right to impose reasonable conditions on their 340B offers by implementing policies that decline to accept 340B orders for an unlimited number of contract pharmacies. For example, subject to further detail explained below, AbbVie will only transfer 340B drugs to one contract pharmacy affiliate of a covered entity, provided it is within 40 miles of said covered entity. That is in stark contrast to the arrangement that covered entities, contract pharmacies, and now, the State of Washington, would like, in which AbbVie would be required to transfer unlimited 340B drugs to dozens or hundreds of contract pharmacies per covered entity.

9.      It is beyond dispute that AbbVie's policy complies with—and indeed, is enabled by—federal law because manufacturers are bound only to "offer" their drugs at discounted prices to covered entities. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 4



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

(D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023). The 340B statute does not compel sales or unconditional offers, nor does it require manufacturers to transfer 340B-discounted drugs wherever and to whomever a covered entity demands. And it certainly does not require manufacturers to subsidize commercial pharmacy profits under the guise of 340B compliance.

10. Unhappy with Congress's decision to permit manufacturers to condition their 340B offers, many States turned to their own legislatures to implement legislation requiring 340B-participating manufacturers to unconditionally sell their 340B-priced drugs to an unlimited number of contract pharmacies. Washington's S.B. 5981 is an example of one such piece of legislation.

11. In particular, S.B. 5981 not only eliminates manufacturers' federally preserved ability to impose reasonable conditions on 340B offers—it imposes new conditions on Medicare and Medicaid participation that Congress never authorized. Among other things, S.B. 5981 prohibits manufacturers from limiting the "acquisition" of 340B-discounted drugs by covered entities or for-profit pharmacies contracted with covered entities. S.B. 5981, § 3(1). Washington's law effectively transfers to covered entities and commercial pharmacies unfettered authority to demand manufacturers' property at significantly reduced prices for the benefit of private parties. Federal courts have recognized the blatant unconstitutionality of such laws and enjoined their enforcement. *See AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266 (W.D. Okla. 2025); *PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024); *see also AbbVie Inc. v. Brown*, 809 F. Supp. 3d 1341 (D. Utah 2025) (concluding that AbbVie plausibly stated preemption and takings claims); *AbbVie Inc. v. Lopez*, No. 1:25-cv-00230, ECF 81 (D. Haw. Feb. 19, 2026) (finding that AbbVie plausibly stated preemption, takings, and Commerce Clause claims).

12. This State-imposed harm—compelling manufacturers to transfer their drugs at discounted prices on terms not required by federal law and to which AbbVie would not

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 5



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

agree—violates the United States Constitution. S.B. 5981 should be enjoined for the following reasons.

13. ***First***, S.B. 5981 is preempted by federal law—namely the 340B Program—under the Supremacy Clause. A State law is preempted when it operates in an exclusively federal field or when it imposes an obstacle to achieving Congress's purposes and objectives. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). Under either standard, S.B. 5981 must yield. Washington's law targets the federal 340B Program and changes its requirements by imposing onerous State-law obligations only on manufacturers who participate in the federal program. *See* S.B. 5981, § 3(1). It also blocks manufacturers from requesting claims data for contract pharmacy dispenses. *See id.* § 3(2). These restrictions impair liberties that the 340B statute includes and prevents AbbVie from accessing the federal 340B administrative dispute resolution system ("ADR"). S.B. 5981 further creates a State enforcement regime and forum that conflicts with the federal government's exclusive authority to enforce the 340B statute. *Id.* § 4. Finally, S.B. 5981 imposes onerous annual reporting requirements on manufacturers that empower Washington to track manufacturer's pricing decisions and further interfere in the 340B Program. *See id.* § 9.

14. ***Second***, S.B. 5981 is an impermissible taking under the Fifth Amendment. Neither the federal government nor the States have any authority to force A-to-B transfers of private property for the benefit of private parties. S.B. 5981 does just that. It requires drug manufacturers like AbbVie to transfer their property at steeply discounted prices to for-profit commercial pharmacies if they have contracts with covered entities that purport to allow them to access AbbVie's drugs at those discounted prices. And S.B. 5981's text makes clear that it seeks to regulate "acquisition" of said drugs at the discounted 340B price. S.B. 5981, § 3(1). Washington has no authority to take AbbVie's private property for private use. By expanding the circumstances under which drug manufacturers must provide 340B-priced

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 6



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

drugs to contract pharmacies, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking). And even if the Washington law did constitute a public use (it does not), AbbVie is still entitled to injunctive relief as Washington provides no just compensation and AbbVie possesses no means to compel just compensation.

15.    ***Third***, S.B. 5981 violates the Commerce Clause under the dormant Commerce Clause doctrine. A State law cannot "directly regulate[] out-of-state transactions by those with *no* connection to the State." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). S.B. 5981 does exactly that, as it dictates the terms of transactions between out-of-state manufacturers (*e.g.*, AbbVie) and any "covered entity," meaning any "entity authorized to participate in the federal 340B drug pricing program, as defined in 42 U.S.C. Sec. 256b(a)(4)." S.B. 5981 § 2(2). Nothing in the statute limits its application to 340B transactions between manufacturers and covered entities in Washington. Washington is attempting to compel AbbVie to act in accordance with Washington law outside of Washington. And even if S.B. 5981 were interpreted to apply only to Washington covered entities, the State law burdens AbbVie, an out-of-state commercial actor, with the sole purpose and effect of benefitting in-state hospitals and pharmacies. That discriminatory treatment likewise violates the dormant Commerce Clause. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008) (citing *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970)). The burden S.B. 5981 places on the national prescription drug industry and the viability of the 340B Program is excessive in relation to any legitimate benefits Washington could reap from it, because there are none—the effect of the bill is to actually harm 340B patients.

16.    ***Fourth***, S.B. 5981 violates the First Amendment. Washington's new law requires 340B-participating manufacturers to disclose meticulous pricing data. Mandatory

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 7

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

reporting laws are subject to First Amendment scrutiny because they compel speech. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024). S.B. 5981 fails any level of constitutional scrutiny because it furthers no cognizable State interest. Washington has no interest in tracking 340B-participating manufacturers' 340B conduct. And even if there were some hypothetical State interest in the information S.B. 5981 seeks, Washington's law fails any tailoring test. The information sought is sensitive business information that manufacturers cannot be forced to provide to the State.

17.     AbbVie seeks a declaration that S.B. 5981 is unconstitutional because it is preempted by federal law, constitutes an unconstitutional taking, regulates excessively out-of-state conduct in violation of the Commerce Clause, and compels speech in violation of the First Amendment. AbbVie further seeks the preliminary and permanent enjoining of S.B. 5981's enforcement against AbbVie.

## PARTIES TO THE ACTION

18.     AbbVie Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience. Since 2012, AbbVie has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need. AbbVie's headquarters are located in North Chicago, Illinois. AbbVie is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HHS's Health Resources and Services Administration ("HRSA").

19.     Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.



20.    Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

21.    AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22.    Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

23.    Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

24.    Defendant Nick Brown is the Attorney General for the State of Washington. The Attorney General is empowered to bring legal actions enforcing S.B. 5981 against manufacturers. *See* S.B. 5981, § 4(2). This suit is brought against the Attorney General solely in his official capacity.

25.    Defendant Ryan Moran is the Director of the Washington State Health Care Authority. The Director is empowered to assess fines against 340B-participating manufacturers for failure to comply with S.B. 5981's new 340B-price reporting requirements. *See id.* §§ 9(7), 10; *see also* RCW 43.71C.090. This suit is brought against the Director solely in his official capacity.

## JURISDICTION AND VENUE

26.    AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

27.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 9



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

28.    The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Court's inherent equitable powers, including the power to enjoin the actions of State officials if contrary to the United States Constitution or federal law, *see Ex parte Young*, 209 U.S. 123, 159-60 (1908).

29.    Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges a Washington law that is applicable to AbbVie's sale and distribution of drugs within this District.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements. Venue is also proper because Defendants maintain offices within this District through which Defendants would enforce the challenged law.

## GENERAL ALLEGATIONS

### A.    The 340B Drug Pricing Program

30.    This case concerns Section 340B of the federal Public Health Service Act, which created the federal "340B Program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

31.    The purpose of the federal 340B Program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

32.    Before Congress created the 340B Program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients.  In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts.  H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 10



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B Program, turning the manufacturers' previous voluntary support into a federal mandate.

33. The 340B statute requires any manufacturer participating in the federal Medicaid Drug Rebate Program (and Medicare Part B) to "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients. 42 U.S.C. §§ 256b(a)(1), 1396r-8.

34. The statute expressly limits participation in the 340B Program to "covered entities." *See id.* § 256b(a)(4). The statute defines "covered entities" to include only fifteen types of organizations and service providers that are supposed to predominantly serve low-income patients. The definition includes, for example, disproportionate share hospitals ("DSH hospitals"), federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients. *Id*. For-profit commercial pharmacies are not included in the statutory list of "covered entities." *Id*. Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom.*, *Sanofi*, 58 F.4th at 703.

35. The discounted 340B price for each of the manufacturers' drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at Section 1927 of the Social Security Act. 42 U.S.C. § 256b(a)(1)-(2), (b). The resulting prices, called 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers. For the vast majority of innovator drugs, the mandatory

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

discounts range from at least 23.1% to more than 99.9% of the average price in the market. *See* 42 U.S.C. §§ 1396r-8(c), 256b(a)(1). For AbbVie, these steep mandatory discounts require offering some medications for a penny per unit of drug. Inclusive of penny-priced drugs, the average mandated discount across AbbVie's pharmaceutical portfolio is over 60% of the pharmaceutical's commercial price.

36. To indicate their agreement to participate in the federal 340B Program and comply with its requirements, manufacturers sign a form contract with HHS called a Pharmaceutical Pricing Agreement ("PPA").

37. The PPA imposes no obligation on participating manufacturers to make unconditional sales to covered entities. Additionally, the PPA neither requires manufacturers to sell discounted drugs to contract pharmacies nor to facilitate the transfer of their discounted drugs to contract pharmacies. Nor does it grant covered entities any unfettered right to access to manufacturers' drugs at discounted prices through contract pharmacies.

38. Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B Program or from profiting off the sale of manufacturers' drugs at discounted prices. Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies. Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat indigent and uninsured patients who visit and receive healthcare services from covered entities, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by covered entities through the federal 340B Program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

39. In recent years, commercial contract pharmacies have earned over ***$3.3 billion*** annually in "spread." In 2023, just five pharmacy chains cumulatively earned nearly $3

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

billion in 340B profits.  Adam J. Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July, 11, 2023), https://tinyurl.com/yfcruj9b; *see also* Eric Percher et al., Nephron Rsch. LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, at 3, 30-31 (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).  Between 2019 and 2023, Wellpartner, a CVS-owned third-party administrator, generated $1.6 billion in revenue from 340B covered entities alone.  U.S. Senate Comm. on Health, Educ., Labor & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 26-27 (Apr. 2025) ("Cassidy Report"), https://tinyurl.com/44c6w2en.

40.     These abuses of the federal 340B Program violate the letter and spirit of the federal 340B statute.  Congress designed the 340B statute with the intent that there would be a close nexus between the federal drug pricing program and its only valid public purpose— helping low-income and uninsured patients (*i.e.*, the public) obtain access to medications at discounted prices.  Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the Program.

41.     The federal statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.").

42.     The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id*. § 256b(a)(5)(A).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 13

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

43. The 340B statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the Program's integrity by "provid[ing] for improvements in compliance by covered entities … in order to prevent diversion" and violations of the statute's duplicate discount prohibition. *Id.* § 256b(d)(2)(A).

44. The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal ADR process. *See id.* § 256b(d)(l)(B)(v), (d)(3). HRSA has issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process. *See* 89 Fed. Reg. 28,643 (April 19, 2024). The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, "340B ADR Panels" constituted of 340B "subject matter experts" are tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue S.B. 5981 seeks to address. *Id.* at 28,644, 28,649; *see also* 42 C.F.R. § 10.21(a). ADR panel decisions are binding, final, and subject only to deferential review by federal courts. *See* 42 U.S.C. § 256b(d)(3)(C); *Astra*, 563 U.S. at 122 ("Congress thus opted … to render the agency's resolution of covered entities' complaints binding, subject to judicial review under the APA.").

45. The statute entrusts enforcement of the 340B Program exclusively to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. § 256b(a)(5)(C)-(D), (d)(l)(B)(v), (d)(3). As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program, and private enforcement by covered entities "would undermine [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119-20. Enforcement by the Washington Attorney General would necessarily have the same undermining effect.

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

46. Failure to comply with the statutory requirements under the 340B Program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid and Medicare) and potentially the imposition of large civil penalties. *See* 42 U.S.C. § 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

**B.     The Growth in Contract Pharmacy Arrangements**

47. In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities that lacked an in-house pharmacy from entering into a contractual relationship with a single outside pharmacy to dispense covered outpatient drugs to the covered entity's patients. 61 Fed. Reg. 43,549 (Aug. 23, 1996). The guidance made clear that it "create[d] no new law and create[d] no new rights or duties." *Id.* at 43,550.

48. Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations. They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

49. In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B Program. The guidance stated, for the first time, that the agency recommended manufacturers allow covered entities to enter into contractual relationships with an ***unlimited*** number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own. 75 Fed. Reg. 10,272 (Mar. 5, 2010).

50. Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers. Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations. *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law."). In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

51.    Following issuance of the 2010 guidance, covered entities, including in Washington, dramatically increased their use of contract pharmacies.   A recent study reported an increase of 12,000% between 2010 and 2024.  *See* Elanor Blalock, *For-Profit Pharmacy Participation in the 340B Program: 2025 Update*, BRG 3 (Jan. 2025) ("BRG Report"), https://tinyurl.com/mrxzr87f.  As of 2023, over 33,000 pharmacy locations—"more than half of the entire U.S. pharmacy industry"—acted as 340B contract pharmacies, up from fewer than 1,300 pharmacy locations in 2010.  *See* Cassidy Report, *supra*, at 3.   This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B-discounted drugs.  For example, in 2009, sales of 340B-priced drugs totaled just $4.2 billion, but by 2023 they had increased by more than 30-fold to $124 billion.  *See* Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, USC Schaeffer Ctr. For Health Pol'y & Econ. 5 (Oct. 2021) ("Mulligan"), https://tinyurl.com/3a5h2zex; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, IQVIA (2024), https://tinyurl.com/ywkdbbju.

52.    Similarly, the number of covered entities participating in the Program jumped from around 15,000 in 2010 to more than 50,000 by 2020.  *See* Mulligan, *supra*, at 4; U.S. Gov't Accountability Off., *Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 23 (2019), https://www.gao.gov/assets/d20108.pdf ("Given the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible.").  The number covered entities participating in the 340B Program within Washington has similarly skyrocketed.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 16



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

53.    Nor does the Program's explosive growth correlate with an increase in indigent patients, or improvements in care and patient outcomes. Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%. *See* Kenneth Finegold et al., U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, *Trends in the U.S. Uninsured Population*, 2010-2020, Issue Brief No. HP-2021-02, at 2 (Feb. 11, 2021), https://tinyurl.com/4rf9cm8t. Moreover, both nationally and in Washington specifically much of the 340B Program's growth has occurred in more affluent areas rather than in more socioeconomically disadvantaged areas. And greater participation in the 340B Program does not typically bring about greater safety net engagement, as measured by uncompensated care, patient health outcomes, or specific service offerings, or charity care.

54.    Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities. *See* Fein, *supra* (stating that five pharmacy chains account for 75% of all 340B contract pharmacy relationships). The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts. Contract pharmacies are not "agents" of the covered entities; they are merely business partners. Indeed, large contract pharmacies like CVS and Walgreens charge "complex fees for pharmacy and administrative services to covered entities" that increase year over year. Cassidy Report, *supra*, at 18. Importantly, these arrangements do not exist outside the context of the federal 340B Program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted 340B drugs to their customers at full prices.

55.    Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 17

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

56. A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B-purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B-purchased inventory.

57. Most contract pharmacies, however, use what is known as the "replenishment" model, which involves the "transfer" of 340B-priced drugs to contract pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not.

58. Under the replenishment model, no 340B-purchased drugs are kept in stock at the contract pharmacy. Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary commercial purchases at the non-340B price (Figure 1, step 1). *See AbbVie Inc. v. Murrill*, No. 6:23-CV-01307 (W.D. La. June 6, 2024) ("*Murrill*"), Summ. J. Hr'g Tr. at 60 (Ron Connelly, counsel for the Louisiana Primary Care Association). Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. As explained below, the pharmacy determines which previous dispenses were 340B eligible and once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price (Figure 1, step 6). The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the covered entity's behalf (Figure 1, step 2). *See* Decl. of RADM Krista M. Pedley, Dir., Off. of Pharmacy Affs., HRSA, *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-00081, ECF 125-2 ¶¶ 3-11 (S.D. Ind.). Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 18

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

**Figure 1.** Replenishment Model Step-By-Step.

59.     Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient" (Figure 1, step 3). *See id.* ¶ 11.

60.     In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B-priced drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories.  Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B-discounted drug.  In almost all instances, contract pharmacies dispense the 340B-priced drugs to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient (Figure 1, step 4).  The contract pharmacy or a Third-Party Administrator ("TPA") carries out a 340B determination at the back end, well after a drug has been dispensed (and likely consumed) by the patient.  This determination is made, typically by a TPA that contracts with both the covered entity and the contract pharmacy, using a black-box algorithm unknown by AbbVie (Figure 1, step 5).  If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 19

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

priced drugs AbbVie must sell. But in reality, the 340B-eligibility criteria applied by covered entities, contract pharmacies, and their TPAs varies widely, including with respect to lookback periods, patient-eligibility windows (*i.e.*, how long after an office visit a person will be considered a patient) and referral capture (*i.e.*, when a 340B covered entity can treat as 340B-eligible prescriptions written by a ***non-340B*** physician to whom the covered entity referred the patient). As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58.

61.     The replenishment model also encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity." *See* 42 U.S.C. § 256b(a)(5)(B).

62.     Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because it "believe[d] that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. at 43,554. Additionally, HRSA assumed that the covered entities purchasing the drugs would retain title to and responsibility for the drugs even after directing shipment to the contract pharmacy. *Id.* at 43,553. In practice, however, covered entities and contract pharmacies do not have an agency relationship, and covered entities do not retain title to or control over the drugs.

63.     As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" the general inventories that they will use to supply non-340B-eligible sales. Significantly, as a result of such replenishment, even though the drugs are purchased by or on behalf of covered entities, contract pharmacies effectively, if not actually, take title to the

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

drugs. At no point in time does a covered entity take title to the drugs under this model. *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Pharmacies*, 340B Report (June 13, 2024), https://tinyurl.com/bdmx88wu (according to a covered entity spokesperson, "in order for the replenishment model to function, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory'"). AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

64. In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans. For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices. Indeed, by some standards, contract pharmacies' profits are so significant that further expansion of contract pharmacy use is unlikely to markedly increase covered entities' revenues.

65. By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B Program. One study found that in 2023 alone, covered entities and their contract pharmacies generated approximately $64 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices. *See* BRG Report, *supra*, at 10. And a recent report from the U.S. Senate Committee on Health, Education, Labor & Pensions found that a covered entity in Virginia generated $276.5 million in 340B savings and revenue from September 2018 through September 2023, while another covered entity in Ohio accrued

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 21



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

$933.7 million in 340B savings and revenue from April 2020 through June 2023.  Cassidy Report, *supra*, at 6.

66.    When commercial pharmacies are brought into the Program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity.  As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real time like a covered entity can). HHS Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 1 (2014) ("HHS Report"), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

67.    Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increase, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit.  *See* U.S. Gov't Accountability Off., *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 44 (June 2018), https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43-44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies, and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

68.    Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B Program, but uninsured and underinsured patients are not benefitting.  *See* HHS Report, *supra*, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

uninsured patients at their contract pharmacies"); Cassidy Report, *supra*, at 9 (explaining that the covered entities under investigation "do not pass 340B discounts directly to their patients and differ on how patients receive discounts on their 340B drugs"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall St. J. (Sept. 10, 2020), https://tinyurl.com/yxehpc7v (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA 12 (Sept. 27, 2022), https://tinyurl.com/2wdtuh52 ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage … in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum 2 (June 17, 2022), https://tinyurl.com/4kvyn9ky (finding that contract pharmacy growth from 2011 to 2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

69.    For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B program to enrich themselves rather than to serve vulnerable communities," and that the hospitals "expanded into wealthier neighborhoods with a higher percentage of insured individuals who could pay more for the drugs."  Dale R. Folwell, N.C. Dep't of State Treasurer, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program*, N.C. State Health Plan 3, https://tinyurl.com/4cy8an69.  Washington is no different: nearly half of Washington's

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

contract pharmacies are located in affluent neighborhoods. *See* Pioneer Institute Public Policy Research, *340B In Washington* (2025), https://tinyurl.com/mwcdynap.

70.    While commercial pharmacies are driving massive growth in the 340B Program—at double-digit annual rates—charity care by hospitals has decreased. Commentators have noted, for example, that as the 340B Program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined. *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, 7-8 (Oct. 30, 2020), https://tinyurl.com/4s5ptxxy; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), https://tinyurl.com/4z8dmjsv.

71.    Both the *New York Times* and *Wall Street Journal* have run exposés describing the flaws in contract pharmacy arrangements—flaws that enable large scale arbitrage and damage the very communities that the federal 340B Program was designed to help. *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. Times (Sept. 24, 2022), https://tinyurl.com/3sbxuswa (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall St. J. (Dec. 20, 2022), https://tinyurl.com/yc2uc6yp ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose.").

72.    A recent *New York Times* investigation into Apexus, the government contractor managing 340B drug pricing, exposed systemic price manipulation, lack of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 24

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

oversight, and financial exploitation within contract pharmacy arrangements—allowing for significant financial abuse at the expense of the communities the Program was meant to protect. Apexus, which is responsible for negotiating better prices and access to mediations, has a direct financial incentive to expand the Program and maximize hospital profits. Because Apexus "is allowed to collect a fee for almost every drug sold under the program," it has actively developed strategies to drive 340B sales and increase covered entity revenue. These strategies include training covered entities on how to maximize 340B revenue; operating a "purchasing optimization team"; advising hospitals on which drugs generate the highest margins; and running a certification program teaching hospitals how to capture more patients and prescriptions under 340B. These tactics have prioritized profit generation over patient benefit, increasing Apexus's and covered entities' financial gains at the expense of patients, insurers, and manufacturers. Hospitals face no restrictions on which outpatient prescriptions they classify as 340B, allowing them to mine patient records from as far back as 36 months to claim additional patients under the Program—even if those patients never directly benefit from the discounts. In some cases, hospitals have passed inflated drug costs onto patients instead of sharing the savings. *See* Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/33ftpfdf.

73.     Congress has also expressed concern over growing abuses in the 340B Program. On April 24, 2025, the Majority Staff of the Senate Health, Education, Labor & Pensions ("HELP") Committee, chaired by Senator Cassidy, released a report titled "Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program,"—the culmination of a nearly two-year investigation into contract pharmacy arrangements and other 340B-related issues. In its findings, the Senate HELP Committee determined that not only have contract pharmacies grown by sheer numbers but major commercial pharmacy

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

chains like CVS, Walgreens, Express Scripts, OptumRx, and Walmart account for 75% of all contract pharmacy relationships. *See* Cassidy Report, *supra*, at 3.

74.     As part of the Senate HELP Committee's investigation, several covered entities expressly told Congress that they do not pass on discounts to patients and do not specifically account for 340B revenue in their budgets. *See id.* at 10. And large commercial pharmacy chains like CVS and Walgreens disclosed that they collect significant fees associated with 340B dispensing. For example, for patients with third-party insurance, CVS collects between $35 and $85 per brand-name drug dispensing event depending on the days' supply of the prescription dispensed. *Id.* at 18. CVS reported to the Committee that in 2023, it made $382 million in 340B-related dispensing fees and "annual gross and net revenues generated from the 340B program." *Id.* at App. 106. Operating as contract pharmacies is so lucrative that CVS and Walgreens disclosed manufacturers' 340B abuse reform efforts as a material risk to their business in their annual reports. *See* CVS Pharmacy 10-K (2022) at 22, https://tinyurl.com/mpwpre9x; Walgreens, Inc. 10-K (2022) at 28, https://tinyurl.com/mu6tfzcu.

75.     While the replenishment model contributes to the abuses described above— issues manufacturers are rightfully trying to address—S.B. 5981 goes further: it mandates that manufacturers sell or transfer discounted drugs on terms Congress never required and that manufacturers never agreed to. The injuries manufacturers face under S.B. 5981 do not stem from the 340B Program itself or even from the replenishment model specifically, but from Washington's attempt to override federal law and impose ***State*** requirements on AbbVie's participation in a ***federal*** program. Even if the replenishment model were eliminated entirely, S.B. 5981 would still compel manufacturers to transfer property under conditions they oppose, stripping them of their federal statutory right to impose reasonable limitations on their 340B offers. In doing so, S.B. 5981 not only conflicts with federal law—

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 26



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

it also effects a taking. The statute forces manufacturers to sell valuable property at below-market rates, to third parties, with no room to impose conditions or decline a sale.

## C.   AbbVie's and Other Manufacturers' Response to HRSA's Overreach

76.   AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B-priced drugs to an unlimited number of commercial pharmacies.

77.   AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B-discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing covered entities.

78.   As 340B abuse continued to grow, with covered entities seeking the provision of 340B-priced drugs to an excessive number of for-profit pharmacies—sometimes located more than 1,000 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies. Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for the in-house pharmacy. However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located within 40 miles of the HRSA-registered covered entity parent site, and that the covered entity submits limited claims data on 340B utilization for that pharmacy location. In addition, Grantee Covered Entities may use an unlimited number of contract pharmacies as long as the Grantee registers with 340B ESP$^{TM}$, a web-based platform made available to covered entities at no cost, and submits claims data. *See* Ltr. from E. Scheidler to 340B Covered Entities (Sept. 23, 2025), https://tinyurl.com/3pw7t8nk.

79.   In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling" price set by statute. *See* 42 U.S.C. § 256b(a)(1). AbbVie is committed



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's 340B-discounted drugs to qualifying patients. If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

80.    AbbVie's policy is consistent with those upheld by the Third and D.C. Circuits. *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463-64.

81.    In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B Program by covered entities and contract pharmacies.

**D.    Litigation in Federal Courts**

82.    After the D.C. and Third Circuits held that manufacturers' abuse-prevention policies are lawful under the federal scheme, *see Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 701, several States enacted their own laws trying to prohibit such policies. Those State laws—passed in Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia—eliminate manufacturers' ability to condition their 340B offers and force manufacturers to transfer their drugs to an unlimited number of contract pharmacies at the 340B-discounted prices. A new round of federal litigation commenced. Manufacturers challenged the laws as unconstitutional on several grounds, and that litigation continues today.

83.    Some courts have allowed the State laws to take effect. *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024). By contrast, the Southern District of West Virginia preliminarily enjoined West Virginia's contract pharmacy law, holding that the law unconstitutionally conflicted with Section 340B. *Morrisey*, 760 F. Supp. at 451-60. The West Virginia court found that laws like Washington's S.B. 5981 regulate "price, not


ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

delivery." *Id.* at 455. Under such laws, "[t]he question is only about what price the pharmacy and the covered entity will pay." *Id.* In other words, "the system is about delivery **at a given price**, not delivery *per se*." *Id.*

84. The Western District of Oklahoma also preliminarily enjoined Oklahoma's contract pharmacy law, holding that manufacturers were likely to succeed on the merits of both their preemption and takings claims. *Drummond*, 808 F. Supp. 3d at 1273-83. Regarding preemption, the Oklahoma court found that Oklahoma's S.B. 5981 analog impermissibly regulates price rather than delivery (although it found the "supposed distinction between 'delivery' and 'price' regulations … artificial") and conflicts with the federal 340B Program's dispute resolution mechanism. *Id.* at 1273-79. The Oklahoma court also held that the Oklahoma law effectuates unconstitutional takings on the grounds that it compels sales for a private rather than public purpose and provides no just compensation. *Id.* at 1278-81. Notably, the Oklahoma court rejected the notion that a manufacturer's participation in the **federal** 340B Program constituted acquiescence to a **State's** appropriation of the manufacturer's property. *Id.* at 1278-79.

85. Other cases await decisions in district court, and appeals are now pending before the U.S. Courts of Appeals for the First, Fourth, Fifth, and Tenth Circuits.

86. Recently, the United States filed amicus briefs in the First and Tenth Circuits in support of AbbVie and other manufacturers. Brief for the United States as Amicus Curiae in Support of Appellants ("DOJ AbbVie Amicus Curiae Brief"), *AbbVie, Inc. v. Weiser*, No. 25-1439 (10th Cir. Feb. 25, 2026), ECF 30; Brief for the United States as Amicus Curiae in Support of Appellants and Reversal ("DOJ PhRMA Amicus Curiae Brief"), *PhRMA v. Neronha*, No. 26-1039 (1st Cir. Feb. 26, 2026). Therein, the United States asserted that laws like S.B. 5981 are preempted several times over. That is because such laws (1) "target[] and discriminate[] against manufacturers that participate in a federal program," (2) "arrogate to the State enforcement authority that properly belongs to the federal government alone," and

(3) jeopardize Congress's aims by making participation in the 340B Program more burdensome than Congress intended, thus disincentivizing participation in federal healthcare programs.  DOJ AbbVie Amicus Curiae Brief, *supra*, at 16-22; *see also* DOJ PhRMA Amicus Curiae Brief, *supra*, at 12, 15.

**E.  The Washington Law**

87.  While the federal 340B statute grants manufacturers the freedom to adopt policies to combat contract pharmacy abuse, Washington turned to its own legislature to take that freedom away.

88.  The Washington legislature introduced legislation, S.B. 5981, to limit manufacturers' right to attach reasonable conditions to the federal 340B offer made to covered entities.  Washington's legislature passed S.B. 5981 on March 9, 2026 and Governor Bob Ferguson signed it into law on March 25, 2026.  S.B. 5981 takes effect on June 10, 2026, which is 90 days after adjournment of the legislative session.  *See* Wash. Const. art. II, § 41.

89.  S.B. 5981 compels manufacturers to transfer discounted 340B drugs to commercial pharmacies.  "A manufacturer or a third party acting on behalf of a manufacturer may not, directly or indirectly, deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law prohibits receipt of the 340B drug."  S.B. 5981 § 3(1).  It thereby revokes what the federal 340B statute grants: manufacturers' liberty to adopt terms and policies that prevent unlawful transactions and other abuses of the 340B Program.

90.  As a practical matter, S.B. 5981 also expands the pool of entities authorized by Congress to receive drugs purchased at 340B prices.  By sweeping in "a pharmacy that is under contract with a covered entity," and "any location authorized by a covered entity to receive" drugs, Washington demands that manufacturers provide commercial contract



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

pharmacies (and whomever else a covered entity so "authorize[s]") unfettered access to their drugs at discounted 340B prices. *Id.* But that is contrary to what Congress intended and enacted. *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *see also id.* § 256b(a)(4) (defining "covered entity" so as not to include contract pharmacies). That expansion of AbbVie's 340B obligations renders S.B. 5981 not only preempted but also an unconstitutional taking. It is beyond dispute that commercial pharmacies and their third-party administrators are profiting from 340B-priced sales. And it is also beyond dispute that, without S.B. 5981, AbbVie would complete far fewer 340B-priced sales. As a result, and in the most direct possible sense, Washington's law forces AbbVie—as part of 340B Program participation—to provide 340B-priced drugs and the corresponding profits to commercial pharmacies and their third-party administrators.

91. The Washington Attorney General is empowered to bring enforcement actions against manufacturers for violating S.B. 5981 in the name of the State or as parens patriae on behalf of persons residing in the State. S.B. 5981, § 4(2). S.B. 5981 violations enforced by the Attorney General constitute "an unfair or deceptive act in trade or commerce and an unfair method of competition" for purposes of Washington's Consumer Protection Act. *Id.* Further, "[i]n addition to any other remedy provided by law, a covered entity may file a civil action against a manufacturer or third party acting on behalf of a manufacturer for a violation of [S.B. 5981]." *Id.* § 4(1). A manufacturer commits a "separate violation" for "[e]ach ***package*** of 340B drugs subject to a prohibited act under [S.B. 5981]." *Id.* § 4(1) (emphasis added). For each violation, a manufacturer may be enjoined and owe a civil penalty of up to $5,000 per day. *Id.*

92. At the same time, S.B. 5981 makes it all but impossible for AbbVie to ensure rudimentary compliance with the 340B Program and avail itself of federal 340B ADR procedures. Washington's law prohibits manufacturers and third parties acting on behalf of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 31


ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

manufacturers from, "directly or indirectly, requir[ing] a covered entity to submit any claims, utilization, purchasing, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law requires such data sharing." *Id.* § 3(2).  As explained further below, however, such data is critical to manufacturers' ability "to utilize the federal dispute resolution system." *Morrisey*, 760 F. Supp. 3d at 453; *see also Drummond*, 808 F. Supp. 3d at 1277-78.

93.    Finally, S.B. 5981 creates onerous annual reporting requirements for drug manufacturers.  S.B. 5981, § 9.  Among other things, the law requires manufacturers to disclose "[t]he number of units, by drug, of 340B drugs distributed to each covered entity and contract pharmacy in Washington," *id.* § 9(7)(a); "[t]he aggregate discounts, by drug, provided to each covered entity and contract pharmacy on 340B drugs" distributed to covered entities and contract pharmacies in Washington, *id.* § 9(7)(b); and "[t]he average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer, including the percentage of the discount imposed due to inflationary rebate … and the discount if it were not capped with a maximum rebate amount," *id.* § 9(7)(c).  These reporting provisions empower Washington to track manufacturer's pricing decisions and further interfere in the 340B Program.

94.    S.B. 5981 cites no source, under the 340B statute or elsewhere, that authorizes Washington to add requirements to the conditions for participating in the federal 340B Program, expand the pool of entities permitted to benefit from 340B pricing, compel the transfer of AbbVie's property at confiscatory prices for private use, or establish an enforcement process that, on the one hand, allows third parties to seek remedies for alleged violations of the federal 340B requirements and, on the other hand, frustrates AbbVie's ability to utilize the enforcement measures Congress created.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 32

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

**STANDING**

95.    AbbVie is financially injured by S.B. 5981 because S.B. 5981 forces AbbVie to complete more heavily discounted sales than it otherwise would.  S.B. 5981 does this by overriding the discretion manufacturers retain under federal law to impose reasonable conditions on their 340B offers and subjecting AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions.  The law forces AbbVie to provide its private property to another private party in a constitutionally prohibited A-to-B wealth transfer.  The law subjects AbbVie to State enforcement through the Attorney General's and the Director's power to enforce S.B. 5981 violations and third-party enforcement in the form of civil suits designed to impose steep financial penalties.

96.    AbbVie's injuries are fairly traceable to S.B. 5981 because the State statute compels a private transfer of AbbVie's 340B-discounted drugs to hospitals and private, for-profit commercial pharmacies—in the absence of any recognized public use or purpose and in violation of federal law.  S.B. 5981 compels sales at the discounted price against AbbVie's wishes and on terms it would not agree to; in other words, in the absence of S.B. 5981, those sales or other transfers to covered entities and their contract pharmacies at the discounted price would not occur.  The statute prohibits AbbVie from enforcing its contract pharmacy policy, but AbbVie will not sell at the 340B price absent agreement to its contract pharmacy policy.  S.B. 5981 thus compels a transaction that would not take place but for the State's law.  Put differently, the existence and enforcement of S.B. 5981 results in the difference between a sale at the discounted price occurring or not.  In addition, the statute seeks to impose new State-law obligations on drug manufacturers participating in the 340B Program beyond those required by the federal statute.  Neither section 340B, nor any existing regulation, nor the PPA, contains these requirements.  Moreover, S.B. 5981 purports to authorize the Attorney General of Washington, the Director of the Washington State Health

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 33

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

Care Authority, and covered entities to enforce S.B. 5981 in a way that violates federal law and infringes on AbbVie's property rights.

97.    A favorable ruling is likely to redress AbbVie's injuries. Enjoining the provisions of S.B. 5981 that unconstitutionally force the taking of manufacturers' private property for no public use would redress AbbVie's injuries because AbbVie's property would not be unconstitutionally taken, and AbbVie would not be exposed to State-imposed penalties for exercising its rights under the 340B Program and the Constitution. Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions, accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

98.    "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Moreover, monetary losses constitute irreparable harm when monetary damages are unavailable due to sovereign immunity. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009) ("[B]ecause [the party] will be unable to recover damages [for their monetary losses] … even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted."), *vacated on other grounds sub nom.*, *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (finding irreparable harm when plaintiff "would be unable to recover monetary damages from Vermont because of the Eleventh Amendment"); *see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." (citing *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010))); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) ("The moratorium [on collecting rent during the COVID-

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

19 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").

99.    "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *see also Petroleum Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 218-19 (1938) ("It is true that the injury which flows from the threat of enforcement of an allegedly unconstitutional, regulatory State statute with penalties so heavy as to forbid the risk of challenge in proceedings to enforce it, has been generally recognized as irreparable and sufficient to justify an injunction."). Because S.B. 5981 violates AbbVie's constitutional rights, AbbVie will suffer irreparable harm absent an injunction.

100.    A taking occurs each and every time a drug manufacturer is compelled to transfer its drugs at the 340B-discounted price to a commercial pharmacy for the private benefit of that for-profit pharmacy. Effecting an unconstitutional taking of AbbVie's private property in a forced transfer to another private party for no recognized public use or purpose constitutes an irreparable injury. *See Melendres*, 695 F.3d at 1002 ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)).

101.    Further, if S.B. 5981 is not enjoined, AbbVie would be exposed to additional State law requirements as a condition of participating in the federal 340B Program. A party may be irreparably injured in the face of the threatened enforcement of a preempted law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013) (granting preliminary injunction where federal immigration law preempted State law aiding unauthorized aliens); *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152 (2d Cir. 2010) (affirming preliminary injunction of city regulations preempted by federal statute).



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

102. If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is likely beyond the capacity of Washington to compensate with damages. Discounted purchases under the Program reached approximately $66.3 billion for fiscal year 2023 in the United States. *See* Health Res. & Servs. Admin., *2023 340B Covered Entity Purchases* (Oct. 2024), https://tinyurl.com/56nzphvm.

103. Any attempt to subsequently recover losses from Washington would likely be barred by the doctrine of sovereign immunity under the Eleventh Amendment. That alone renders AbbVie's financial losses "irreparable injury" for purposes of seeking an injunction. *Cal. Pharmacists Ass'n*, 563 F.3d at 851–52.

104. The cost to AbbVie of complying with State laws like Washington's is substantial. For example, AbbVie estimates that the annual cost of complying with similar State laws in Mississippi and Missouri is around $33.1 million and $35 million, respectively. Complying with Washington's law will cost AbbVie tens of millions of dollars per year (if not more). And as the number of States adopting these kinds of laws increases, so does the irreparable harm imposed.

As of filing, at least 20 other States have already passed contract pharmacy laws akin to Washington's S.B. 5981—but with material differences among and between those State laws, complicating compliance and subjecting manufacturers to different and varying enforcement. *See generally* App'x.

105. Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from S.B. 5981. That is, the law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the private benefit of that pharmacy and for no recognized public use, in violation of the U.S. Constitution. The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B Program.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 36

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

And S.B. 5981 threatens to impose significant penalties upon manufacturers if they do not capitulate to Washington's attempt to modify the terms of the federal 340B Program. The deprivation of constitutional rights constitutes irreparable injury for purposes of a preliminary injunction. *See Melendres*, 695 F.3d at 1002 ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)); *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)).

106.    Prospective injunctive relief is appropriate even if the Court finds that Washington's taking is for public use. AbbVie's rights are violated the moment of the taking. *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 190 (2019). Once that occurs, AbbVie has recourse against Washington as State law does not provide AbbVie with a remedy and the Eleventh Amendment bars a suit for monetary relief brought under 42 U.S.C. § 1983. *See Quern v. Jordan*, 440 U.S. 332, 340 (1979); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

107.    Granting injunctive relief here would not harm Washington. It is well settled that States have no interest in enforcing a regulation that violates federal law. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns"); *Upshaw v. Alameda Cnty.*, 377 F. Supp. 3d 1027, 1033 (N.D. Cal. 2019) ("[T]he government cannot be harmed by an injunction that forbids an unconstitutional practice."); *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Moreover, there is no evidence that uninsured and needy patients—in Washington or anywhere else—benefit from the use of contract pharmacies. Washington has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 37

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

108.    Granting injunctive relief would also be in the public interest.  The contract pharmacy system that S.B. 5981 protects provides no ascertainable benefits to patients or the greater public.  Greater 340B revenues do not lead to increased uncompensated care, charity care, or improved patient care and outcomes.  Contract pharmacy arrangements do not increase patient access to medications or reduce the prices patients pay.  The only beneficiaries of this system are hospitals, commercial pharmacy chains, and their third-party administrators.  Moreover, the public has a strong interest in unconstitutional laws being enjoined, particularly those laws that force a transfer of private property for no public use or purpose. *See Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) ("[A]ll citizens have a stake in upholding the Constitution."); *Ariz. Dream Act Coal.*, 757 F.3d at 1069 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available.... On the contrary, the public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'" (citations omitted)); *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1129 (E.D. Cal. 2016) ("The public has no interest in enforcing unconstitutional laws.").  Further, the public has a strong interest in enforcing federal law, not permitting States to change the requirements for participating in federal healthcare programs and not permitting States to inhibit efforts to effectively administer interrelated federal healthcare programs.

## FIRST CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption Under the*

### *Supremacy Clause, U.S. Const. art. VI, cl. 2*

109.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

110.    Under the Supremacy Clause of the Constitution, federal law is "the supreme Law of the Land …, any Thing in the Constitution or Laws of any State to the Contrary

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

notwithstanding." U.S. Const. art. VI, cl. 2.  As a result, federal statutes enacted by Congress can preempt State law.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 654 (9th Cir. 2021) ("[I]f a state law 'conflicts with, or frustrates, federal law, the former must give way.'" (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993))).

111.    Preemption can take multiple forms: express preemption, field preemption, and conflict preemption. *See FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007).

112.    One type of preemption is conflict preemption.  Conflict preemption occurs where it is impossible for a private party to comply with both State and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 372–73 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations adopted).  Washington's S.B. 5981 conflicts with or otherwise obstructs Congress's 340B Program in multiple ways.

113.    S.B. 5981 conflicts with federal law by targeting the federal 340B Program and its participants and seeking to change the terms of that program.  It is foundational constitutional law that States may not regulate Congress's creations.  *See McCulloch v. Maryland*, 17 U.S. 316, 359 (1819); *see also United States v. Washington*, 596 U.S. 832, 838 (2022) (explaining that States may not "interfer[e] with or control[] the operations of the Federal Government").  Yet that is all that S.B. 5981 does.  It dictates the terms upon which manufacturers must sell drugs at confiscatory prices and to whom manufacturers must sell them.  And it requires manufacturers to report extensive data so that Washington may meticulously track manufacturer's pricing decisions.  Washington's law applies only to those manufactures who participate in the federal 340B Program, however, and thus has no purpose or effect aside from regulating 340B conduct.  But AbbVie "cannot be subjected to discriminatory regulations because it contracted with the federal government." *Boeing Co.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 39



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

*v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014). And Washington "may not require [terms] … in addition to" or different from "those that the Government has pronounced sufficient" in the 340B statute and the PPAs. *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (cleaned up).

114. S.B. 5981 is especially problematic in this sense because the 340B Program entails a contractual relationship (PPAs) between the United States and manufacturers. *See also Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("Spending Clause legislation [is] much in the nature of a contract …." (emphasis omitted)). The terms of that contract—AbbVie's access to Medicaid and Medicare Part B in exchange for congressionally identified hospitals receiving discounted drugs—are laid out in the 340B statute. 42 U.S.C. § 256b. Therefore, even if federal law is silent about the extent of manufacturers' obligations to contract pharmacies, as many States contend, that just means that Congress decided ***not*** to include restrictions like the ones found in S.B. 5981 as a part of the bargain. Congressional silence is not an invitation for Washington to tack on new terms to the United States' contract with AbbVie or single out those with federal contract relationships for special State-law disabilities. *See Washington*, 596 U.S. at 838-41 (providing that the Supremacy Clause prohibits States from "discriminat[ing] against … those with whom [the federal government] deals" by "'singl[ing] them out' for less favorable 'treatment'" or by "regulat[ing] them unfavorably on some basis related to their governmental 'status'"); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988).

115. The government that created and administers the 340B Program agrees. *See* DOJ AbbVie Amicus Curiae Brief, *supra*, at 11-16; DOJ PhRMA Amicus Curiae Brief, *supra*, at 10-15. Specifically, in recent amicus curiae briefs before the United States Courts of Appeals for the First and Tenth Circuits, the United States argued that Rhode Island's and Colorado's S.B. 5981 analogs violate the Supremacy Clause by "impermissibly target[ing] and discriminat[ing] against manufacturers that participate in [the 340B Program]" through

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 40



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

the "impos[ition of] additional burdens." DOJ AbbVie Amicus Curiae Brief, *supra*, at 12-13; DOJ PhRMA Amicus Curiae Brief, *supra*, at 12.

116.   S.B. 5981 also undeniably imposes new State-law obligations that have the purpose and effect of expanding the 340B Program. Washington compels manufacturers to make more confiscatory priced sales than the 340B Program contemplates. And S.B. 5981 broadens the class of entities entitled to receive 340B-discounted prices and forces manufacturers to transfer their discounted drugs to third parties—specifically, commercial pharmacies—who are not covered entities. Washington's law thus directly conflicts with the federal 340B statute, which leaves manufacturers free to impose reasonable conditions on their 340B offers and authorizes discounts only to covered entities. *See Drummond*, 808 F. Supp. 3d at 1276-77 (holding that a comparable statute was preempted because it "effectively expands the definition of 'covered entity' to include contract pharmacies, … 'contrary to federal law'"); *Brown*, 809 F. Supp. 3d at 1359-60 (finding AbbVie stated a plausible preemption claim against an analogous State law because the law "meaningfully expands the scope of entities entitled to 340B discounts"). Indeed, Congress specifically defined which entities qualify for 340B discounts and intentionally chose not to mandate manufacturer participation in contract pharmacy arrangements. *See AstraZeneca*, 543 F. Supp. 3d at 60. As the United States has recognized, laws like S.B. 5981 "are significant enough to alter any manufacturer's cost-benefit analysis" of whether to continue participating in the 340B Program. DOJ AbbVie Amicus Curiae Brief, *supra*, at 17. "Only the federal government can determine the extent to which it will tolerate the risk of manufacturer withdrawal." *Id.* "Congress properly determines what conditions should attach to 340B Program participation, and [Washington] is not free to supplement that scheme." *Id.* at 18.

117.   S.B. 5981 creates other conflicts, too. For example, Washington's law bars a manufacturer from demanding "claims, utilization, purchasing, or other data" from covered



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

entities.  S.B. 5981, § 3(2).  But the federal 340B Program contemplates that manufacturers can request such data.

118.    The federal 340B statute forbids the "transfer" of 340B-discounted drugs to anyone but a covered entity's patients. 42 U.S.C. § 256b(a)(5)(B).  If a manufacturer suspects that such diversion is occurring between a covered entity and its contract pharmacy, the only way to enforce that violation is through the federal ADR process (not State or other federal law, or even through private suit).  *See id.* § 256b(d)(3); *accord Astra*, 563 U.S. at 121-22.  However, to access the federal ADR process, the 340B statute requires that a manufacturer first "conduct an audit of a covered entity … as a prerequisite to initiating [ADR] proceedings against a covered entity."  42 U.S.C. § 256b(d)(3)(B)(iv).  And before a manufacturer can conduct an audit, it must have "reasonable cause" to suspect a violation of the 340B statute—which requires access to claims data.  *See* 61 Fed. Reg. 65,406, 65,407 (Dec. 12, 1996) (providing that "audits are to be performed only when there is a reasonable cause to believe that there has been a violation" of the 340B statute).  The federal enforcement scheme therefore operates through a sequence of required steps: a manufacturer must first identify indicia of diversion or duplicate discounts, then conduct an audit, and only then may it invoke the federal ADR process.

119.    S.B. 5981 interferes with that sequence by imposing an absolute ban on manufacturers "directly or indirectly, requir[ing] a covered entity to submit any claims, utilization, purchasing, or other data as a condition for allowing the acquisition of a 340B drug[.]"  S.B. 5981, § 3(2).

120.    Claims data is a critical component of AbbVie's ability to avail itself of the exclusive federal 340B remedies.  HRSA "require[s] manufacturers to submit an audit work plan … to establish reasonable cause."  61 Fed. Reg. at 65,406.  And HRSA also provides that audits should be performed only "where there are valid business concerns."  *Id.* Manufacturers must review claims-level utilization information to determine whether an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 42

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

apparent anomaly reflects legitimate utilization or a potential violation of the 340B Program, thus establishing "reasonable cause" and the commencing of an audit and potentially an ADR proceeding. Claims-level data from covered entities includes prescription identifiers, prescriber information, pharmacy/dispensing identifiers, patient eligibility data, or other claim-level fields necessary to determine whether a drug was dispensed to an eligible patient or whether duplicate discounts occurred. Without such claims-level data, manufacturers only have access to routine data for 340B sales, which is limited to order quantities, shipments, invoices, and chargeback information tied to National Drug Codes, date, and delivery location. This routine information may not (and often does not) provide the necessary indicia of noncompliance that AbbVie would need to establish "reasonable cause."

121. Indeed, manufacturers use claims data—as opposed to routine 340B sales data—to identify abuse within the program and to identify audit targets. For example, AbbVie is aware of a covered entity that has several child sites and locations around New York City, and those various sites have overlapping contract pharmacy arrangements. Once analyzed, claims data revealed that those covered entities submitted multiple replenishment orders for the same patient dispensing event—essentially seeking double, triple, or quadruple replenishment. Without conditioning access to claims data on AbbVie's 340B offers, AbbVie would have no practical ability to identify this kind of overbilling and to pursue audits or ADR remedies for this sort of misconduct by covered entities.

122. Covered entities (and contract pharmacies) do not voluntarily provide claims-level utilization data to manufacturers, so AbbVie must condition its offers upon access to it.

123. Therefore, by preventing manufacturers like AbbVie from requiring claims data or otherwise seeking clarity from covered entities, Washington effectively forecloses manufacturers' only avenue to pursue audits or claims against covered entities for violations of the 340B Program's requirements. On this basis, two district courts found that analogous claims data provisions in West Virginia and Oklahoma directly conflicted with federal law

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

and were preempted. *See Morrisey*, 760 F. Supp. 3d at 451-53; *Drummond*, 808 F. Supp. 3d at 1277-78.

124.    Washington's law also creates new and extensive reporting obligations unique to 340B-participating manufacturers.  Under S.B. 5981, AbbVie will be required to report to Washington the precise number of 340B-priced units distributed to covered entities and contract pharmacies in Washington, the "aggregate discounts, by drug, provided to each covered entity and contract pharmacy" in Washington, and the "average 340B discount on each of the top 25 340B drugs dispensed in the state" by AbbVie, "including the percentage of the discount imposed due to inflationary rebate, as described in 42 U.S.C. § 1396r-8(c)(2)(A) and (C), and the discount if it were not capped with a maximum rebate amount, as described in 42 U.S.C. Sec. 1396r-8(c)(2)(D)."  S.B. 5981 § 9(7)(a)-(c).  This requirement not only discriminates against 340B-participating manufacturers by saddling them with burdens that other manufacturers escape, but it also further evidences that Washington is concerned only with the availability of 340B *pricing*, even though the availability of the 340B price is a matter of exclusive federal regulation.

125.    Washington's law also conflicts with the federal 340B Program by installing a parallel enforcement regime.  The Attorney General is empowered to "bring an action in the name of the state, or as parens patriae on behalf of persons residing in the state, to enforce" this law.  S.B. 5981, § 4(2).  Further, S.B. 5981 provides covered entities with the ability to "file a civil action against a manufacturer or third party acting on behalf of a manufacturer" for violating this law.  *Id.* § 4(1).  But "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities" or States.  *See Astra*, 563 U.S. at 117.  Pursuant to that authority, HHS specifically created ADR review for claims related to 340B "overcharge[s]."  42 C.F.R. § 10.21(a)(1).  Notably, both HHS and covered entities agree that this ADR review encompasses claims that a manufacturer limited covered entities' acquisition of 340B drugs, including by limiting the



use of contract pharmacies. *See, e.g.*, Am. Hosp. Ass'n, Comment on 340B Drug Pricing Program; Administrative Dispute Resolution ("ADR Rule"), HRSA-2022-0001-0030 (HRSA Jan. 27, 2023), at 2, https://tinyurl.com/4znmhz86. Washington's S.B. 5981—by creating a new forum for enforcing the 340B Program and giving private parties the ability to sue manufacturers—is thus an even more brazen attempt to end-run Congress's choice not to include private or State enforcement of 340B than was at issue in *Astra*. 563 U.S. at 118 ("The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the [HHS-manufacturer] contract's ceiling-price obligations instead.").

126. Congress not only defined who was entitled to administer the 340B Program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), but it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B Program for handling disputes among manufacturers and covered entities concerning 340B Program compliance. *See* 42 U.S.C. § 256b(d)(1)-(3). The 340B statute also spelled out the types of claims it expected to be resolved through ADR—"claims by covered entities that they have been overcharged for" 340B drugs. *Id.* § 256b(d)(3)(A). HRSA accordingly designed ADR to resolve "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 U.S.C. § 10.21(a)(1). These are the very disputes that Washington's enforcement regime covers. *See* S.B. 5981, § 4(1)-(2). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B Program and engage in "overcharging." *See* 42 U.S.C. § 256b(d)(1)-(3). Washington's attempt to install an alternative compliance and enforcement regime is preempted. *Wis. Dep't of Indus., Labor & Hum. Relations v. Gould Inc.*, 475 U.S. 282, 291 (1986) (finding a State law pursuing a



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

federal goal preempted because "it assumes for the State of Wisconsin a role Congress reserved exclusively for the Board").

127. Another type of implied preemption is field preemption, which occurs where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Commc'n of Kan.*, 489 U.S. 493, 509 (1989)). Field preemption occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

128. Every element of the federal 340B Program—from eligibility and pricing to compliance and enforcement—is governed by federal law. Federal law controls not just the dollar amount of the 340B price but also the circumstances under which manufacturers are required to make that discounted price available to covered entities. Because the availability of the 340B price "is exclusively controlled by the federal statute, … state enforcement of it would necessarily intrude on the federal scheme." *Morrisey*, 760 F. Supp. 3d at 458 (internal citation omitted); *see also Drummond*, 808 F. Supp. 3d at 1275-77 (finding Oklahoma's contract pharmacy law preempted because it regulates "the *price* at which [] drugs must be sold"). S.B. 5981 directly intrudes on the federal 340B scheme. Washington's law bars manufacturers from "directly or indirectly, deny[ing], restrict[ing], or prohibit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law prohibits receipt of the 340B drug." S.B. 5981, § 3(1). And the term "340B drug" is defined by reference to the 340B ceiling price established by federal law. *Id.* § 2(1). Thus, the Washington law prohibits manufacturers from conditioning their 340B offers by declining to transfer their drugs to contract pharmacies *at a particular price*. *See*


ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

*Morrisey*, 760 F. Supp. 3d at 455-56; *Drummond*, 808 F. Supp. 3d at 1275-77.  Manufacturers violate laws like S.B. 5981 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering [their] drugs to those pharmacies." *Morrisey*, 760 F. Supp. 3d at 455-56; *see also Drummond*, 808 F. Supp. 3d at 1275-77 (same).  That S.B. 5981 defines the drugs at issue as "340B drug[s]" confirms that the statute is a price regulation:  "*Price* is what distinguishes between an 'ordinary drug' and a 340B Program drug—a fact that seems to be reflected in the [Washington] statute itself." *Morrisey*, 760 F. Supp. 3d at 455-56 (emphasis added); *see also Drummond*, 808 F. Supp. 3d at 1276 ("[W]hen H.B. 2048 defines a '340B drug' as a 'drug that has been subject to any offer for reduced prices by a manufacturer pursuant to [42 U.S.C. § 256b] and is purchased by a covered entity as defined in [42 U.S.C. § 256b(a)(4)]' it does so in recognition of the fact that the only difference between a '340B drug' and a non-340B drug is ... [its] price." (second and third alterations in original) (footnote omitted)).  Accordingly, by *expressly* regulating the availability of the 340B price, defining "340B drug" to mean "a drug that has been subject to an offer for *reduced prices* by a manufacturer under [the 340B Program] and is purchased by a covered entity," and tethering the definition of "covered entity" to "the federal 340B *drug pricing* program," S.B. 5981 clearly intrudes on the federal 340B Program.  S.B. 5981, § 2(1), (2) (emphasis added).

129.   S.B. 5981 was enacted in response to manufacturers' policies, which (according to covered entities) result in overcharges.  But the federal statute does not authorize State regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices.  It leaves no room for States to interfere with the carefully designed, federally created 340B Program.  *See Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, State laws that impose additional obligations are preempted).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 47

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

130.    The federal 340B statute carefully prescribes who may access 340B discounts, when, and under what conditions—including compliance with federal anti-diversion and duplicate discount requirements.  The federal statute governs how prices and discounts are calculated and what obligations manufacturers must follow, requiring them to offer 340B pricing *only* to covered entities—not third parties.  *See* 42 U.S.C. § 256b(a)(1).  There can be no question that the 340B Program is a federal creation through and through.

131.    The growing patchwork of divergent State laws exacerbates the constitutional and compliance problems.  The difficulty of complying with varying State regulatory frameworks only increases as more States pass new and different laws relating to the 340B Program.  As of filing, 20 other States have passed contract pharmacy laws akin to S.B. 5981.  State laws such as those passed by Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia have material differences among and between themselves, complicating compliance by manufacturers and subjecting manufacturers to different and varying enforcement.  *See, e.g.*, W. Va. Code § 60A-8-6a (extending prohibitions to an "agent, or affiliate" of a manufacturer); La. Rev. Stat. § 40:2883 (prohibiting a manufacturer from "prevent[ing] or interfer[ing] with *any patient's choice* to receive such drugs from the 340B entity" (emphasis added)); N.M. H.B. 78, § 1(A)(4), 57th Leg., 1st Sess. (2025) (covering only entities "receiv[ing] federal grant funding"); Neb. L.B. 168, § 3(1), 109th Leg., 1st Sess. (2025) (compelling delivery to "*any location*" authorized by a covered entity (emphasis added)).  Some States, like Tennessee, prohibit requiring the submission of claims data while others do not.  *Compare* Md. Health Occupations Code § 12-6C-09.1(c)(1) (prohibiting restrictions on "delivery" or "acquisition" of "340B drugs"), *with* Tenn. S.B. 1414, § 47-18-136(a)(1), 114th Gen. Assembly (2025) (restricting the collection of "any health information, claims or utilization data, purchasing data, payment data, or other data").  Some States, like Utah,

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

impose criminal penalties for failure to comply while others do not. *Compare* Mo. Rev. Stat. §§ 407.095, 407.100, 407.110 (allowing for civil penalties), *with* Utah Code Ann. § 31A-2-308(9) (making violations of the statute a Class B misdemeanor).

132.    As these laws continue to accrete, administration of the 340B Program and compliance with a patchwork of State laws may become untenable, with potential catastrophic effects for the nationwide prescription drug industry and for Medicaid and Medicare beneficiaries. *See* Adam J. Fein, *EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), https://tinyurl.com/4jdjhh7u (analyzing HRSA data to find the 340B Program accounted for "16% of … total U.S. gross sales of brand-name drugs at list prices" in 2020); *Drummond*, 808 F. Supp. 3d at 1277 n.65 (referencing a drug manufacturer's decision to withdraw from federal health programs because of the 340B Program's rising costs).

133.    Importantly, the injury here flows ***not*** from the federal 340B Program itself, but from Washington's attempt to override and distort it. S.B. 5981 imposes new obligations that conflict with the structure Congress created. Here, AbbVie does not challenge Congress's design or dispute the requirements imposed under federal law. Rather, it challenges Washington's effort to rewrite those requirements by transforming a conditional federal offer into a mandatory, State-enforced sale on terms the federal statute does not require (and which may in fact even ***violate*** the federal statute), and by effectively foreclosing AbbVie's ability to access the federal enforcement scheme. Washington's law does not fill a gap: It tears through the fabric of the federal scheme Congress designed to be uniform, voluntary, and within the exclusive federal enforcement authority of HHS.

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

**SECOND CLAIM FOR RELIEF**

*Prospective Injunctive Relief and Declaratory Relief –*

*Violation of Takings Clause, U.S. Const. amend. V, cl. 4*

134.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

135.    The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V; *see also Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234-35 (1897) (incorporating and making applicable to States the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

136.    The Takings Clause extends to both real and personal property. *Horne*, 576 U.S. at 358. It is not limited to instances when the government physically appropriates property for its own use through eminent domain. A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights. *See E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998).

137.    Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties. *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation"). Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to allow government to "take[] property from A. and give[] it to B.").

138.    "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Statutes or regulations that mandate the physical transfer of personal property from one private party

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 50



to another private party amount to an unconstitutional taking with or without just compensation.

139.    Washington's S.B. 5981 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.  On its face, S.B. 5981 prohibits manufacturers from "deny[ing]," "restrict[ing]," or "prohibit[ing]" the "acquisition" of drugs at 340B-discounted prices by "a covered entity," "a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity," or "any location authorized by a covered entity to receive such 340B drug."  S.B. 5981, § 3(1).  Washington thus requires manufacturers to provide their drugs to covered entities, commercial pharmacies, and other covered-entity-authorized entities at below-market prices by adding a State-law obligation onto the federal 340B scheme.  That is an impermissible *per se* taking under the Constitution's Takings Clause.  *See Drummond*, 808 F. Supp. 3d at 1279-80 (finding that Oklahoma's contract pharmacy law "effects an [*per se*] unconstitutional taking" "for purposes of bestowing a private benefit"); *Brown*, 809 F. Supp. 3d at 1360-62 (same).

140.    S.B. 5981 mandates that pharmaceutical manufacturers provide drugs at below-market prices, depriving them of control over their own pricing structures and revenue.  It compels sales or transfers of AbbVie's drugs at the 340B-discounted price that, in the absence of S.B. 5981, would not occur.  AbbVie's offer is conditioned on the covered entity's acceptance of AbbVie's contract-pharmacy policy.  Without S.B. 5981, if a covered entity counteroffered with a term requiring unlimited contract pharmacy access, AbbVie would simply refuse and no sale at the 340B-discounted price would take place.  However, S.B. 5981 compels AbbVie to accept the counteroffer and complete the sale at the discounted price on terms AbbVie would not otherwise have agreed to.

141.    S.B. 5981 expands the federal 340B Program requirements in a way that shifts financial burdens onto manufacturers, reducing revenue without just compensation and with

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 51



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

no justified public use. *See Drummond*, 808 F. Supp. 3d at 1280 (finding an analogous law a *per se* taking because it does not "serve[] a *Kelo*-kosher public purpose" and the "confiscatory" prices it mandates do no constitute just compensation).

142. Even if there were a public use here, AbbVie will never receive just compensation. State law provides none, and the Eleventh Amendment prevents AbbVie from seeking monetary relief from Washington in a 42 U.S.C. § 1983 suit.

143. In the alternative, S.B. 5981 effectuates a regulatory taking.

144. In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

145. S.B. 5981's requirement that manufacturers transfer their drugs to commercial pharmacies effectuates a constitutionally impermissible regulatory taking because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use and imposes significant financial losses on AbbVie and other manufacturers. S.B. 5981 interferes with drug manufacturers' reasonable investment-backed expectations because manufacturers did not agree to comply with State 340B laws as part of its agreement to participate in the 340B Program and, for most of the Program's history, conditions like those included in AbbVie's contract pharmacy policy were standard practice. And the character of S.B. 5981—a regulation that serves no valid government purpose and deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties—renders Washington's law self-evidently unconstitutional.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 52

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

**THIRD CLAIM FOR RELIEF**

*Declaratory/Injunctive Relief –*

*Commerce Clause, U.S. Const. amend. XIV*

146.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

147.    Central to our federal constitutional structure is the principle that "all States enjoy equal sovereignty." *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013). "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (citation omitted). This basic principle manifests in the several constitutional provisions that limit the power and authority of the States in relation to each other. *See, e.g.*, U.S. Const. art. I, § 10 (denying certain powers States otherwise might enjoy as sovereign nations); *id.* art. IV, § 1 (Full Faith and Credit Clause); *id.* art. IV, § 2, cl. 1 (Privileges and Immunities Clause); *id.* art. IV, § 2, cl. 2 (interstate extradition).

148.    The Commerce Clause—which grants Congress the "Power ... To regulate Commerce ... among the several States," U.S. Const. art. I, § 8, cl. 3—also implicitly limits the extraterritorial authority of the States. The Supreme Court has held that the Commerce Clause prohibits States from directly "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989); *see also Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).

149.    State regulations with an "extraterritorial effect" in other States can therefore violate the Commerce Clause. *Nat'l Pork Producers*, 598 U.S. at 374. Indeed, the Supreme Court recently reaffirmed its precedents finding State laws unconstitutional where they "*directly* regulated out-of-state transactions by those with *no* connection to the State." *Id.* at



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

376 n.1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982)). A State statute may violate the dormant Commerce Clause in three ways: (1) "by discriminating against interstate commerce," (2) by effecting extraterritorial control of commerce occurring entirely outside the boundaries of the State in question, and (3) "by unduly burdening interstate commerce." *Flynt v. Bonta*, 131 F.4th 918, 925-26 (9th Cir. 2025).

150. S.B. 5981 runs afoul of dormant Commerce Clause principles on all three fronts.

151. ***First***, S.B. 5981 discriminates against interstate commerce in favor of in-state commerce. The central aim of Washington's law is to privilege in-state covered entities and pharmacies over out-of-state manufacturers by forcing the manufacturers to provide drugs at significantly reduced prices to hospitals and pharmacies that would not otherwise be entitled to reduced prices under federal law. When Washington enforces this scheme, ensuring bargain basement pricing for the direct benefit of in-state entities, it will significantly burden out-of-state manufacturers like AbbVie.

152. Washington cannot articulate any valid justification for discriminating against out-of-state drug manufacturers and in favor of in-state hospitals and pharmacies. As detailed above, 340B patients do not benefit when AbbVie is compelled to transfer more drugs at reduced costs to hospitals and contract pharmacies. Those compulsory discounts—which layer on top of AbbVie's ***federal*** 340B obligations—serve only to create arbitrage profits for hospitals and commercial pharmacy chains.

153. As a result, Washington uses a federal program to benefit in-state covered entities and contract pharmacies themselves at the expense of out-of-state manufacturers like AbbVie. This "'simple economic protectionism'" is an illegitimate legislative interest. *Nat'l Pork Producers*, 598 U.S. at 372 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986)). Indeed, it is precisely that which the dormant Commerce Clause doctrine aims to prevent.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 54



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

154.   **Second**, S.B. 5981 has the practical effect of extraterritorial control on interstate commerce. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (finding State statute that "regulates a commercial transaction that 'takes place wholly outside of the State's borders'" violates the dormant Commerce Clause (citation omitted)); *see Healy*, 491 U.S. at 336 (concluding that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature"). Covered entities often enter contract pharmacy arrangements with pharmacies located outside their State. For example, an Idaho or Oregon covered entity may have contract pharmacies in Washington.

155.   Such out-of-state covered entities may purchase drugs from out-of-state manufacturers, like AbbVie. But those transactions are swept within S.B. 5981's ambit, since the statute bars **all** "manufacturer[s]" from "directly or indirectly, deny[ing], restrict[ing], or prohibit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug[.]" S.B. 5981, § 3(1). This is particularly so as the statute defines "manufacturer" as **any** "person, corporation, or other entity engaged in the manufacture of drugs or devices," *id.* § 2(3), and "covered entity" as **any** "entity authorized to participate in the federal 340B drug pricing program, as defined in 42 U.S.C. Sec. 256b(a)(4)," *id.* § 2(2)—both without any geographic limitation. These provisions thus permit the Attorney General to use S.B. 5981 to regulate and fine out-of-state manufacturers based on their conduct *outside* of Washington. They also empower out-of-state covered entities to file civil actions against out-of-state pharmaceutical manufacturers for alleged violations of S.B. 5981. *See id.* § 4(1).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 55

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

156.   S.B. 5981 therefore prohibits *any* manufacturer across the country from imposing conditions on the transactions between itself and *any* covered entity that has contracted with a Washington-licensed pharmacy.  *See id.* § 2(5) (defining "pharmacy" as "every place properly licensed by the commission where the practice of pharmacy is conducted").  S.B. 5981 attempts to justify this extraterritorial control on interstate commerce by explaining that "prohibiting drug manufacturers from imposing restrictions on 340B covered entities is necessary to ensure the integrity of the 340B program and protect Washington's vulnerable patients, their access to medications, and safety net providers' ability to serve their patients."  *Id.* § 1(8).  Similarly, the statute conveys the State's belief that manufacturers' policies "jeopardize the financial savings" on which "safety net providers depend."  *Id.* § 1(7).  Despite these in-state interests, S.B. 5981 lacks sufficient in-state hooks.  For example, it does not require that a Washington pharmacy contract with a Washington 340B covered entity before availing itself of S.B. 5981's protections.  *See id.* § 2(4).  To maximize the flow of benefits into Washington, by way of Washington contract pharmacies, the State protects covered entities everywhere—and does so at the expense of manufacturers located outside of Washington.

157.   Thus, with S.B. 5981, Washington attempts to regulate manufacturers' nationwide practices and impose restrictions on their national supply chains.  *South Dakota v. Wayfair*, 585 U.S. 162, 188 (2018) (finding that substantial nexus requires more than just sales to in-state residents; it requires an actual connection to the state).

158.   ***Third***, S.B. 5981 imposes a burden on interstate commerce that outweighs any conceivable benefit to in-state commerce.  *Pike*, 397 U.S. at 142.  Such burdens, even when they are nondiscriminatory, violate dormant Commerce Clause principles.  *See id.*

159.   S.B. 5981 imposes a very high burden on the 340B Program and the national prescription drug industry.  It forces manufacturers to transfer discounted drugs to ***any*** covered entity in the country that happens to have a contract with a Washington-licensed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 56



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

pharmacy. This effectively compels manufacturers to sell discounted drugs nationwide based on Washington's mandates, imposing an extraterritorial economic burden on drug manufacturers located in various States across the country.

160. Additionally, S.B. 5981 violates the dormant Commerce Clause doctrine because its regulation of interstate commerce subjects AbbVie to inconsistent legislation across the country. *See Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993).

161. S.B. 5981 will ensure only that hospitals and pharmacies reap massive windfalls—it will not provide 340B-eligible patients with greater access to medication, improve their health outcomes, or reduce their healthcare costs. Manufacturers, unable to impose conditions, will be powerless to stop the abuses that result in covered entities requiring "insured patients to pay *more* for their prescriptions at contract pharmacies so the covered entity can generate 340B funds." Peter J. Pitts & Robert Popovian, *340B and the Warped Rhetoric of Healthcare Compassion*, Food & Drug L. Inst. Update Mag. (Fall 2022) (emphasis added), https://tinyurl.com/yc6fnc5c. S.B. 5981 provides no legitimate benefit to the State of Washington and thus cannot outweigh the high burden it places on the national drug industry and the 340B Program itself.

### FOURTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief –*

### *Free Speech Clause, U.S. Const. amend. I*

162. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Washington's law violates AbbVie's right to refrain from speaking by forcing AbbVie to report extensive and sensitive business information relating to its pricing.

163. S.B. 5981 requires AbbVie to disclose "[t]he number of units, by drug, of 340B drugs distributed to each covered entity and contract pharmacy in Washington," S.B.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 57



ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

5981 § 9(7)(a); "[t]he aggregate discounts, by drug, provided to each covered entity and contract pharmacy on 340B drugs" distributed to covered entities and contract pharmacies in Washington, *id.* § 9(7)(b); and "[t]he average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer, including the percentage of the discount imposed due to inflationary rebate … and the discount if it were not capped with a maximum rebate amount," *id.* § 9(7)(c). But for S.B. 5981's requirements, AbbVie would not provide this information, which it typically guards as both a trade secret and proprietary information.

164.    Reporting laws like S.B. 5981—even when they do not compel trade secrets and proprietary information—are subject to First Amendment scrutiny. *See, e.g.*, *NetChoice*, 113 F.4th at 1117 ("[T]he forced disclosure of information … triggers First Amendment scrutiny."). But S.B. 5981 cannot withstand any level of scrutiny.

165.    The State of Washington has no legitimate interest in meticulously tracking 340B-participating manufacturers' 340B pricing activities. AbbVie's provision of the 340B price, whether in Washington or anywhere else, is exclusively a matter of federal concern.

166.    Even if there were some cognizable State interest in the information sought by S.B. 5981, the State law fails any tailoring test. S.B. 5981 imposes a great burden on AbbVie. It requires AbbVie to disclose to the State of Washington—which in some cases operates the very covered entities to whom AbbVie must sell its discounted medications— trade secrets and proprietary information. Indeed, AbbVie has moved for (and been granted) leave to seal the very sort of information S.B. 5981 calls for. *See AbbVie v. Weiser*, No. 25-1439, ECF 24 at 5-7 (10th Cir.) (describing "Evidentiary Exhibit 94," which contained "sensitive commercial data" that "would negatively impact AbbVie's business and competitive position" if disclosed).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 58

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

**PRAYER FOR RELIEF**

**WHEREFORE**, AbbVie prays for the following relief:

1. A declaration, order, and judgment holding S.B. 5981 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

2. A declaration, order, and judgment declaring that S.B. 5981 effects an unconstitutional taking of AbbVie's property;

3. A declaration, order, and judgment declaring that S.B. 5981 violates the Commerce Clause;

4. A declaration, order, and judgment declaring that S.B. 5981 violates the First Amendment;

5. A declaration, order, and judgment holding that the federal 340B statute does not require drug manufacturers to unconditionally provide 340B pricing to covered entities or contract pharmacies, or to transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

6. A declaration, order, and judgment holding that the federal 340B statute empowers drug manufactures to require covered entities to provide claims data in exchange for 340B pricing;

7. A preliminary and permanent injunction enjoining Defendants from enforcing S.B. 5981 against AbbVie;

8. An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

9. Any other relief that this Court deems just and proper.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 59

ARÊTE LAW GROUP
600 University St, Suite 2420
Seattle, WA 98101
O: (206) 428-3250

DATED:  March 25, 2026.

**ARETE LAW GROUP PLLC**

By: */s/ Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
600 University Street, Suite 2420
Seattle, WA 98101
Phone: (206) 428-3250
jroller@aretelaw.com

**KIRKLAND & ELLIS LLP**

Matthew S. Owen, P.C. (*pro hac vice* application forthcoming)
Meredith Pohl (*pro hac vice* application forthcoming)
Blair Husted (*pro hac vice* application forthcoming)
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
blair.husted@kirkland.com

*Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
Page 60



# Appendix

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WA | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restricts collection of claims data** | – | ✓ | – | – | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Defines "340B entity" to include pharmacies** | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | – | – | – |
| **Applies only to certain 340B covered entities** | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | – |
| **Prohibits conditioning 340B offers on receipt of contracts** | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – |
| **Requires "acquisition" by a pharmacy or entity** | – | ✓ | ✓ | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Requires delivery to any location** | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ |

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WA | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Prohibits "interfering" with "eligible patients" or pharmacies** | – | – | – | – | – | ✓ | – | – | – | ✓ | – | ✓ | ✓ | – | ✓ | – | – | – | ✓ | – | – |
| **Prohibits use of rebates** | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – | – |
| **Restricts right to impose time limits on replenish-ment orders** | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – |
| **Applies to an "agent" or "affiliate"** | – | ✓ | ✓ | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Imposes criminal sanctions** | – | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | – | ✓ | ✓ | – | – | – | ✓ | ✓ | – | – | – |
| **Creates a private right of action** | – | ✓ | ✓ | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | – |